UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:16-cr-53 (TSE) |
| HAMZA KOLSUZ | ) | |

**MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorneys, Dana J. Boente, United States

Attorney for the Eastern District of Virginia; Heather N. Alpino, Special Assistant United States

Attorney; and Dennis M. Fitzpatrick, Assistant United States Attorney, hereby submits the United

States' "Memorandum in Aid of Sentencing" with respect to the above-captioned case.

The Court has found defendant Hamza Kolsuz guilty of all three counts of the indictment

against him, specifically, one count of conspiracy to violate the Arms Export Control Act (the

"AECA"), 22 U.S.C. §§ 2778(b) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1, and 18 U.S.C.

§ 554, in violation of 18 U.S.C. § 371; one count of attempting to export firearms parts to the

Republic of Turkey without the requisite license, in violation of the AECA; and one count of

smuggling goods from the United States, in violation of 18 U.S.C. § 554.   Significantly, from on

or about December 2, 2012 through on or about February 2, 2016, the defendant conspired to

export, and attempted to export, a large quantity of firearms parts worth thousands of dollars from

the United States to Turkey in blatant violation of U.S. export laws.   Such activities implicate

both the national security and foreign policy of the United States.

The AECA authorizes the President of the United States to control the export of defense

articles by designating items, such as certain weapons and their components, on the United States

Munitions List ("USML"), which is codified at 22 C.F.R. § 121.1.  The term "defense article" refers to any item or technical data designated on the USML.  22 C.F.R. § 120.6.  The purpose of the AECA is the "furtherance of world peace and the security and foreign policy of the United States."  22 U.S.C. § 2778(a)(1).  The AECA and its attendant regulations, the International Traffic in Arms Regulations, 22 C.F.R. Parts 120 through 130, require a person to apply for and obtain an export license from the United States Department of State's Directorate of Defense Trade Controls (the "DDTC") before exporting from the United States arms, ammunition, or articles of war, which are all classified as defense articles under 22 U.S.C. §§ 2778(b)(2) and 2794(7), and 22 C.F.R. §§ 120.1 and 121.1.

The Probation Office has determined that the defendant's total offense level under the U.S. Sentencing Guidelines is 28, which, in conjunction with the defendant's Criminal History Category of I, results in a Guidelines range of 78 to 97 months' imprisonment.  For the following reasons, the government requests that the Court impose a substantial prison sentence.

## I.  Background

Kolsuz has on at least three occasions since 2012 attempted to smuggle various weapons parts from the United States to the Republic of Turkey to resell those parts in Turkey for a profit, in extreme disregard for U.S. export laws that exist in order to prevent the proliferation of weapons and protect our country's and other countries' national security.  Specifically, on December 2, 2012, Kolsuz, accompanied by Bayram Bulut and Saffet "Rocco" Bulut (hereinafter "the Bulut brothers"), checked in for a flight at John F. Kennedy International Airport ("JFK Airport") in New York with a final destination of Istanbul, Republic of Turkey.  A search of Kolsuz's luggage by law enforcement officials revealed that his luggage contained:  forty upper receivers for

semi-automatic pistols; twenty grip modules for Sig Sauer pistols; sixteen barrels for semi-automatic pistols; twenty-six firearms magazines; sixty springs/internal parts for firearms; and one pistol grip.   After these firearms parts were found, law enforcement provided Kolsuz and the Bulut brothers with information on U.S. export regulations, including the USML and the requirement of obtaining a license to lawfully export firearms parts.   Law enforcement also informed the three men that the firearms parts—which were laid out in front of them—were defense articles listed on the USML and therefore required an export license from the DDTC—as well as a registration with the DDTC as an exporter—in order to be lawfully exported from the United States.   All of the firearms parts were detained and later seized and were never returned to Kolsuz.

Kolsuz thereafter remained in the United States.   However, instead of choosing to obey the export laws of the United States, of which he was by then fully informed, Kolsuz, Bayram Bulut, and another Turkish-speaking individual attempted to purchase a large quantity of firearms and/or firearms parts from Marc Benowitz at Benson's Gun Shop in order to ship them to Turkey. (Findings of Fact ¶¶ 13–16.)   This occurred on December 14, 2012, a mere twelve days after the December 2, 2012 incident at JFK Airport.   The third individual persistently asked Benowitz to ship AR-15 rifles and Colt 45s—or, in the alternative, parts for these firearms—to Turkey to serve as a replacement for the firearms parts that had been detained on December 2, 2012.   After Benowitz gave the individuals his business card and told them that he would inquire as to whether he could provide the firearms and/or firearms parts and ship them to Turkey, the individuals left and Benowitz never heard from or saw them again.   After the individuals left, Benowitz, who was extremely suspicious, called a police hotline to report the encounter because of all of the red flags

the encounter raised for him.

Weeks later, on January 8, 2013, Kolsuz again checked in for a flight at JFK International Airport with a final destination of Istanbul.  Despite having been specifically informed on December 2, 2012 that it was illegal to export weapons parts without an export license, his checked luggage contained one Beretta slide, one firearm barrel, one Beretta recoil spring, and one Beretta guide rod, all of which are on the USML and require an export license or other written approval from the DDTC in order to be lawfully exported from the United States.

From October 2015 through January 2016, Kolsuz and co-conspirator Bayram Bulut communicated using the Kik messaging application and agreed to:  the purchase and pricing of firearms and/or firearms parts, including purchasing firearms parts for the specific purpose of Kolsuz exporting them to the Republic of Turkey; send money to pay for the purchase of firearms and/or firearms parts; take specific steps to avoid detection from law enforcement and customs officials; export firearms and/or firearms parts through the mail; and make plans to meet in person to purchase firearms and/or firearms parts that Kolsuz would export from the United States to Turkey.  In addition, in January 2016, Bayram purchased ten handgun barrels from Lone Wolf Distributors for Kolsuz to illegally export to Turkey.  (Findings of Fact ¶¶ 28–31.)

On January 25, 2016, Kolsuz traveled from Istanbul to the United States, where he and Bayram Bulut visited pawn shops, gun stores, and a gun show to buy additional firearms parts that Kolsuz would smuggle back to Turkey.  On February 2, 2016, Kolsuz began his return trip to Istanbul by checking in at Miami International Airport for a flight that took him to Cleveland Hopkins International Airport.  He then checked in for a flight that was to take him and his checked luggage from Cleveland through Washington Dulles International Airport before

embarking for Istanbul.  In Cleveland, Kolsuz checked luggage containing forty-six firearms parts, specifically:   four 9mm Glock 31-round magazines; four 9mm Glock 17-round magazines; four 9mm Glock 15-round magazines; one 9mm Smith & Wesson 17 round magazine; eight 9mm Glock 10-round magazines; four .45 caliber Glock 13 round magazines; one 9mm Smith & Wesson 32-round magazine; one 9mm handgun barrel; four 9mm Sig Sauer handgun barrels; one threaded Sig Sauer barrel; twelve threaded Glock barrels; one .357 caliber Glock 15-round magazine; and one .22 caliber Glock caliber conversion kit.

While Kolsuz was waiting to board his flights, he and Bayram communicated using the iChat instant messaging application regarding how to avoid detection and export the firearms parts to Turkey without the parts being detained by law enforcement.   In the iChat messages, Kolsuz also keeps Bayram up to date regarding the status of his circuitous journey to Istanbul and whether the firearms parts have been detected by law enforcement.

All of the weapons parts found in Kolsuz's checked luggage on December 2, 2012; January 8, 2013; and February 2, 2016 are and were defense articles controlled on the USML and therefore required a license or other written approval from the DDTC in order to be lawfully exported from the United States.  Kolsuz has never applied for and has never received any licenses or other written approval from the DDTC to export defense articles from the United States.  Accordingly, on each occasion when defense articles were found in Kolsuz's checked luggage, those articles were seized by law enforcement and were never returned to Kolsuz.

II.     **The Applicable Guidelines Range Is Correctly Calculated at 78 to 97 Months of Imprisonment, with a Statutory Cap of 60 Months for Count 1 of the Indictment.**

A.     Overview

As this Court is aware, after *United States v. Booker*, 543 U.S. 220 (2005), the district court

5

must engage in a multi-step process in sentencing a defendant.   First, the court must correctly determine, after making appropriate findings of fact, the applicable Guidelines range.   *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).   In doing so, the Court must make factual findings, supported by a preponderance of the evidence, to support any pertinent guidelines enhancements.   *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009); *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004).   "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'"   *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).

That the Sentencing Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence.   "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.   *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Abu Ali*, 528 F.3d 210, 260 (4th Cir. 2008).   Indeed, given the Sentencing Commission's important institutional role and expertise, the recommended guidelines range typically will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."   *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)); *see also United States v. Lymas*, 781 F.3d 106, 112 (4th Cir. 2015).   The district court must therefore "consider the guideline range applicable to the defendant and pertinent policy statements of the Sentencing Commission."   *United States v. Perez-Pena*, 453 F.3d 236, 241 (4th Cir. 2006); *see also United States v. Hughes*, 401 F.3d 540, 548 (4th Cir. 2005) ("In the wake of *Booker* . . . a sentencing court is still required to 'consult [the] Guidelines and take them into account when

sentencing.'" (quoting *Booker*, 543 U.S. at 264)).   If the district court imposes a sentence outside the guideline range, the court must explain its reasons for the variance as required by 18 U.S.C. § 3553(c)(2).   *Id.*; *see also United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009); *Abu Ali*, 528 F.3d at 260 ("If the sentencing court believes 'an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" (quoting *Kimbrough*, 552 U.S. at 597)); *United States v. Moreland*, 437 F.3d 424, 434 (4th Cir. 2006) ("The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be.").

The United States has reviewed the Presentence Investigation Report ("PSR") and has no additions, corrections, or objections to the PSR.   The PSR properly calculates a base offense level of 26 at Criminal History Category I, with a two-level enhancement for obstruction of justice. This places the defendant in an advisory guidelines range of 78 to 97 months' imprisonment.

B.      Application of the Obstruction of Justice Enhancement

As explained in the PSR, the defendant's blatantly untruthful testimony at trial supports the application of a two-level sentencing enhancement for obstruction of justice.   Section 3C1.1 of the United States Sentencing Guidelines permits a two-level upward adjustment to a defendant's offense level when:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

U.S.S.G. § 3C1.1.   Conduct covered by this provision includes committing perjury and "providing materially false information to a judge."   *Id.* § 3C1.1 n.4.

7

In its "Findings of Fact and Conclusions of Law," the Court determined that the defendant's trial "testimony that on February 2, 2016, he did not know it was generally unlawful to export the firearms parts in issue without a license or authorization from the DDTC" was incredible.  (Findings of Fact ¶¶ 47, 54.)   Specifically, the Court found the following testimony by the defendant to be incredible:   (1) his testimony regarding what Special Agent Fede told him on December 2, 2012, and that Special Agent Fede never explained any export requirements to him; (2) his testimony regarding "his reasons for attempting to export firearms parts to Turkey," including that he purchases firearms parts to engrave as a hobby and that selling these parts comprises only a small portion of his income; (3) his testimony that he "took . . . steps to ascertain the status of the firearm parts that had been detained on December 2, 2012;" (4) his testimony regarding the identity of the third individual present with him at Benson's Gun Shop on December 14, 2012; (5) his testimony regarding his circuitous flight path from Florida to Istanbul that was planned in order to decrease the likelihood that he would be caught attempting to illegally export firearms parts to Turkey; and (6) his testimony regarding who purchased the firearms parts found in his checked luggage on February 2, 2012.   (Findings of Fact ¶¶ 48–53.)   With respect to the defendant's testimony that he purchased and engraved firearms parts as a hobby, the Court found that this testimony was "a deliberate attempt to conceal defendant's unlawful actions by making it appear that defendant lacked knowledge that it was generally unlawful to export firearms parts from the United States without a license or authorization from the DDTC."   (Findings of Fact ¶ 49.)

Accordingly, during his trial testimony, Kolsuz provided testimony that he knew to be false.   In addition, this testimony was material and relates to the defendant's offenses of

conviction as it bears on the willfulness element of each of the three charges against the defendant, *i.e.*, that the defendant knew that it was generally unlawful to export firearms parts from the United States without U.S. government authorization.   The United States therefore submits that the two-level sentencing enhancement for obstruction of justice should be applied to Kolsuz.

### III.    The 18 U.S.C. § 3553(a) Sentencing Factors Support a Substantial Sentence.

Pursuant to 18 U.S.C. § 3551, a defendant must be sentenced "in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case."   This mandate is repeated in the first sentence of § 3553(a), which states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   This section then explains that, in determining a particular sentence, a sentencing court must consider certain enumerated factors.   Thus, § 3553(a) serves two functions:

> First, it prescribes that every sentence comply with the four announced *purposes* for sentencing.   Second, it lists seven *factors* that a court must consider in determining a particular sentence, and included as one of the factors is the list of announced purposes for sentencing in § 3553(a)(2).
>
> \*     \*     \*     \*
>
> The proper application of § 3553(a) therefore requires a sentencing court to focus on the four *purposes* of sentencing, as applicable in a particular case, and to consider, in determining a sentence that achieves those purposes, the seven *factors* listed in § 3553(a)(1)–(7).

*United States v. Shortt*, 485 F.3d 243, 247–48 (4th Cir. 2007).   These factors, however, can themselves overlap.   *See, e.g.*, *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006)

(comparing, for example, promoting respect for the law under § 3553(a)(2)(A) and affording adequate deterrence under § 3553(a)(2)(B)).

In this case, the § 3553(a) factors are consistent with a substantial sentence.   Of particular significance are:   (1) the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct, and (4) unwarranted sentencing disparities.

> **A.**   The Nature and Circumstances of the Offense and the Need for the Sentence
> Imposed to Reflect the Seriousness of the Offense

The nature and circumstances of the offenses for which Kolsuz has been convicted warrant a substantial sentence.   As a preliminary matter, the stop of Kolsuz at Dulles Airport on February 2, 2016 marked the third time he had been stopped by federal law enforcement officers while attempting to smuggle weapons parts from the United States to Turkey.   Furthermore, Kolsuz willfully conspired to, and attempted to, export USML items with full knowledge of the licensing requirements.   Indeed, even assuming that Kolsuz did not know prior to December 2, 2012 that it was illegal to export firearms parts without a license from the DDTC, he certainly knew it was illegal as of that date yet still engaged in the same type of illicit conduct on January 8, 2013 and February 2, 2016.   (*See* Findings of Fact ¶ 11.)

Moreover, the defendant conspired to and attempted to export firearms parts to Turkey to be reassembled into complete firearms.   (Findings of Fact ¶ 26.)   Indeed, Kolsuz obtained a B-2 visitor's visa to travel to the United States from Turkey on January 25, 2016 for the sole purpose of purchasing firearms parts that he would export to Turkey and then reassemble into complete firearms.   Kolsuz would purchase large quantities of firearms parts worth thousands of dollars in

the United States and then resell them as complete firearms to other individuals for a large profit. (Findings of Fact ¶¶ 26, 49.)   Because the lawful export process, including applying for a license from the DDTC by Kolsuz or the Bulut brothers, was not followed, these customers in Turkey or elsewhere would not be subject to the DDTC's end user screening to determine whether an export would be consistent with U.S. national security concerns.

In addition, Kolsuz and Bayram Bulut engaged in a great amount of planning and deceit in order to facilitate exporting the firearms parts to Turkey.   For example, Kolsuz and Bayram Bulut specifically planned that Kolsuz would check his luggage for his international flight at Cleveland Hopkins International Airport rather than at Miami International Airport in order to decrease the likelihood that he would be caught attempting to illegally export firearms parts to Turkey. (Findings of Fact ¶¶ 35, 52.)   In addition, in the Kik conversations, Kolsuz and Bayram Bulut discussed taking specific steps to avoid detection by law enforcement and customs officials, as well as trying to avoid the mistakes that led to the discovery and subsequent seizure of firearms parts in 2012 and 2013.   (*See* Findings of Fact ¶¶ 25–26.)   These steps included Bayram Bulut and Kolsuz discussing hiding gun parts in large metal items—such as a plastic injection oil cooler tank and pressure drains—so that customs would not find the parts.   (Findings of Fact ¶ 26 n.11.) Moreover, while Kolsuz was waiting to board his flights for his circuitous journey out of the United States, he and Bayram Bulut communicated using the iChat instant messaging application regarding how to avoid detection and export firearms parts to Turkey without the parts being detained by law enforcement.   (*See* Findings of Fact ¶¶ 25–26, 36.)   Additionally, when Special Agent Fede interviewed Kolsuz at Dulles Airport on February 2, 2016 and February 3, 2016, Kolsuz lied and specifically stated that he—not Bayram Bulut—had purchased various firearms

11

parts in Florida that were in his checked luggage.   (*See* Findings of Fact ¶¶ 43, 53.)

Kolsuz engaged in all of this conduct in complete disregard for the United States' export laws.   Indeed, the Kik conversations between Kolsuz and Bayram Bulut confirm that Kolsuz was interested in exporting "forbidden" firearms parts because such parts are "more precious," and also show Bayram Bulut discussing with Kolsuz how the United States is "tight-assed" in terms of export control.   (Findings of Fact ¶ 26; *see also* Gov't's Ex. 33G at 506; Trial Tr. at 167.) Furthermore, Kolsuz's and Bayram Bulut's conduct was harmful or had the potential to be harmful to the national security and foreign policy interests of the United States.   Specifically, when reassembled into complete firearms in Turkey—which is in a volatile part of the world and is adjacent to Syria—these U.S. firearms parts had the potential to be used against Americans and allies abroad.   Indeed, Kolsuz's conduct involved potentially lethal and inherently dangerous goods that have a single purpose:   to enable a person to expel or shoot bullets or ammunition through a metal tube using explosive force.   Firearms are not designed for any other purpose. Such illegal export activity has the potential of putting weapons in the hands of criminals and terrorists and endangering U.S. national security, public safety, and foreign policy.

However, the DDTC was never given an opportunity to evaluate whether such an export would be acceptable and in line with the United States' national security and foreign policy interests.[1]   Indeed, that Kolsuz chose to circumvent U.S. export laws is unsurprising given that the DDTC would have denied any application he submitted for an export license because foreign

---

[1] In an application for an export license, exporters are required to state, among other things, the nature of the armaments to be exported, the end recipient of the armaments, and the purpose for which the armaments were intended.   The defense articles subject to such licensing requirements are designated on the USML, and those designations are made by the State Department with the concurrence of the Defense Department under 22 U.S.C. § 2778(a)(1) and 22 C.F.R. § 120.2.

nationals, with certain exceptions, may not receive a license or other written approval from the DDTC to export defense articles from the United States.   (Findings of Fact ¶ 46 n.19.)

According to the relevant Guidelines application notes, "[i]n determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security or foreign policy interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.2 n.2.   As explained above, Kolsuz's crimes were serious and involved planning and deceit.   His offenses involved multiple occurrences and a large number of firearms parts worth thousands of dollars to a country of national security concern with relatively restrictive gun laws.   These offenses were not mere oversights or performed without knowledge of the illegality of his conduct.   Instead, they were deliberate choices of a savvy individual seeking to avoid detection.   Accordingly, the United States submits that a substantial sentence is warranted based on the facts of this case.

B.      The History and Characteristics of the Defendant

The defendant has no one to blame but himself for his situation.   The conduct engaged in here was undertaken by a man from a relatively stable and loving family.   This Court encounters many criminal defendants who have few life options.   This defendant had options, and he chose greed over obeying the law.   Indeed, despite having substantial family support in Turkey and his own business in Turkey, Kolsuz chose a different a path, one in which he repeatedly traveled to the United States for the purpose of illegally exporting firearms parts.

C.      The Need for the Sentence Imposed to Afford Adequate Deterrence

Deterrence and promoting respect for the law should be a principal goal of the Court's

sentence here.   A substantial prison sentence can have a real deterrent effect and serve as a true warning to anyone who is tempted to ignore this country's export laws.   Through its punishment of Kolsuz in this case, the Court can send the message that export violations, particularly those with national security implications, are—as Congress, the President, and the U.S. Sentencing Guidelines intended them to be—grave matters that warrant real punishment.

      D.     <u>Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))</u>

The starting point in the Court's analysis under § 3553(a)(6) is the sentences of "defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).   While sentences in AECA cases vary greatly, sentencing the defendant to a substantial sentence is consistent with sentences imposed on similarly situated defendants, *i.e.*, defendants who have been sentenced in connection with cases involving firearms and firearms parts.   For example, a defendant who pled guilty to one count of a four-count indictment charging him with unlawfully exporting gun parts and ammunition in violation of the AECA—specifically, three take-down pins, one trigger housing unit, one bolt group, one sighting group, one magazine release, three receivers, one stock, one buffer spring, ten magazines, two boxes of cartridges, and three boxes of weapons primers—to the Philippines was sentenced to 40 months' imprisonment followed by 3 years of supervised release.   *United States v. Sero*, 520 F.3d 187, 189 (2d Cir. 2008) (affirming sentence).   Here, however, Kolsuz attempted to export far more firearms parts and the conspiracy to illegally export firearms parts contemplated sending even more parts from the United States to Turkey.   In addition, Kolsuz's 2016 conduct arguably involved more serious firearms parts because the parts included threaded barrels to which silencers can be attached and did not include any springs.

Additionally, in *United States v. ODonnell*, Crim. A. No. 10-491 (N.D. Ga.), the defendant was sentenced to 37 months' imprisonment after he pled guilty to one count of conspiring to violate the AECA and the International Emergency Economic Powers Act and two counts of violating the AECA in connection with him illegally exporting and attempting to export holographic weapon sights and four upper receivers to Hong Kong and Japan.  Moreover, in *United States v. Carter*, Crim. A. No. 07-54 (D. Me.), the defendant pled guilty to conspiring to illegally export eighteen handguns to Canada and was sentenced to 31 months of imprisonment. Unlike the instant case, in all three of these cases, the defendants pled guilty and received point reductions for acceptance of responsibility.   In addition, the defendants in *Sero* and *ODonnell* did not receive enhancements for obstruction of justice, as is justified here in light of the defendant's perjurious trial testimony.   In light of these cases, the Court should impose a substantial sentence on Kolsuz.

## IV.     Conclusion

The defendant's state of mind and conduct in this case were egregious.  After a fair evaluation of the sentencing factors set forth in 18 U.S.C. § 3553(a), the government submits that a substantial sentence is warranted in this matter.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/_____
         Heather Alpino
         Special Assistant United States Attorney
         Eastern District of Virginia
         United States Attorney's Office

15

2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (202) 514-0620
Heather.Alpino@usdoj.gov

Dennis Fitzpatrick
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3954
Dennis.Fitzpatrick@usdoj.gov

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 30, 2016, I filed the foregoing with the Clerk of Court using the CM/ECF system.

By:     /s/_____
        Heather Alpino
        Special Assistant United States Attorney
        Eastern District of Virginia
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Phone: (703) 299-3936
        Heather.Alpino2@usdoj.gov

17