# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

**UNITED STATES OF AMERICA,**

    v.                                      Criminal No. 1:16-cr-53 (TSE)

**HAMZA KOLSUZ.**                        Sentencing Date: October 7, 2016

         **Defendant.**

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Pursuant to Title 18 U.S.C. § 3553(a), Mr. Hamza Kolsuz, through counsel, hereby notifies the Court that he has received and reviewed the Pre-Sentence Investigation Report ("PSR"), and has no objections to the Report's calculation of the advisory sentencing range. Further, Mr. Kolsuz agrees with the United States that a substantial prison sentence – though less than that called for by the Sentencing Guidelines – is appropriate in this case. The Guideline at issue here is so arbitrary that it groups together in one offense level everything from handgun parts to automatic weapons to fighter jets, missiles and satellite technology. To grasp the senselessness of such a Guideline, imagine the drug Guideline with a single offense level applicable to all drugs and quantities, from a few grams of marijuana to truckloads of heroin. Such an ill-conceived Guideline would be roundly rejected by the courts. The Guideline here is equally irrational and, likewise, should be given no weight in this Court's sentencing analysis.

Mr. Kolsuz submits that a sentence of eight months' incarceration is appropriate and fully accounts for the purposes of sentencing in this case. That would be sixty percent longer than the sentence this Court imposed in a previous case with very similar facts – which involved smuggling dozens of assault-rifle parts to Sudan while that country was enmeshed in a genocidal war in Darfur and was also a hotbed of fundamental Islamic terrorism. *See United States v. Ahmed*, 1:08-cr-95

(TSE). Mr. Ahmed did not go to trial, but the sentence requested here is sixty percent longer than was imposed there, which accounts for any difference between the cases (and other differences, such as the type of weapon parts at issue in Mr. Ahmed's, militate in the other direction – in favor of a lower sentence for Mr. Kolsuz). The sentence requested here is also consistent with several other sentences imposed by this Court and with others in this district.

The sentence requested here is also appropriate in light of the unusually difficult circumstances of Mr. Kolsuz's incarceration – as a Turkish-speaker with extremely limited English language ability and no connection to this area, he has had virtually no ability to meaningfully interact with others during his incarceration. In addition, he has not had access to reading material, television or radio in a language he can understand, nor has he had nearby family or friends to visit him during his incarceration. These circumstances render his incarceration far more difficult than the norm. Moreover, Mr. Kolsuz now has an aggravated felony conviction and faces near-certain removal following service of his sentence. Given that the offense here was made possible by Mr. Kolsuz's ability to legally enter the United States with a visa, the collateral consequences of an aggravated felony conviction are not only an additional punishment, but they also essentially eliminate any risk of recidivism or future danger to the United States. Considering all of these circumstances, a sentence of the eight-plus months Mr. Kolsuz has already served is fully sufficient to accomplish the purposes of sentencing.

**I.      Legal Standard**

Determining the proper sentence in a federal criminal case is within the discretion of the District Court. The Court's discretion is to be exercised upon consideration of the purposes of sentencing in light of the particular case and the particular defendant before it. The Supreme Court

has emphasized that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). The Court's decisions in *Nelson* and *Spears* build upon its earlier decisions in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), establishing that the Sentencing Guidelines are simply an advisory tool to be considered alongside the other § 3553(a) statutory considerations.

"Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson.* 555 U.S. at 352. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* (emphasis in original). In other words, sentencing courts commit legal error by using the advisory guidelines range as a default to be imposed unless a basis exists to impose a sentence outside that range.

Upon consideration of the seven co-equal factors set forth in § 3553(a), a sentencing court may find that the case falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). While the sentencing court must begin its analysis by correctly calculating the advisory sentencing range, the court is then free in light of the other statutory sentencing factors to impose an entirely different sentence. This is because, under *Rita,* a district court is free simply to disagree, based on the § 3553(a) sentencing factors, with the Sentencing Guidelines' "rough approximation" of the appropriate sentence for any given case. *Id.*

In particular, the Guidelines fail to confront the basic principle that the appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The Sentencing Guidelines remain in tension with this principle, and do a particularly poor job of incorporating a person's history and characteristics in the determination of an appropriate sentence. *See* U.S.S.G. § 5H1.2 et seq. (noting that education, vocational skills, employment record, family ties, sex, socio-economic status, civic work or charity, public service, and a disadvantaged upbringing generally are not relevant to sentencing).

II. **Counts Two and Three Merge into a Single Count for Purposes of Sentencing Because The Offense of Conviction in Count Two is a Lesser Included Offense of the Offense of Conviction in Count Three**

The Double Jeopardy Clause prohibits the imposition of separate sentences on two offenses where one is a lesser-included offense of the other. *Blockburger v. United States*, 284 U.S. 299 (1932). In this case, Count Two is a violation of a statute (the Arms Export Control Act) which bans the export of certain items without a license (22 U.S.C. § 2778(b)), while Count Three is a violation of a statute banning the exportation of any item contrary to law (18 U.S.C. § 554(a)). In other words, all violations of the statute charged in Count Two (a narrowly-tailored law against certain exports) will also constitute violations of the statute charged in Count Three (a general law against all exports made illegal by other laws). This makes Count Two a lesser included offense of Count Three, because the elements of a § 2778(b) violation are a subset of the elements of a § 554(a) violation.

4

Indeed, the law cited in the Indictment in this case to support the "contrary to law" element of Count Three is the Arms Export Control Act violation charged in Count Two.

Accordingly, the two counts merge into a single count for purposes of conviction. This would appear to make little practical difference for sentencing purposes, because the offenses group under the Sentencing Guidelines and would ordinarily result in concurrent sentences under 18 U.S.C. § 3584 regardless. But the Court should nonetheless enter only one count of conviction for the two offenses, and should impose only a single sentence and a single special assessment.

## III. The Export-Control Guideline Groups Handgun Parts in the Same Offense Level With Attack Helicopters, Tanks and Satellite Technology, Resulting in an Absurd Sentencing Range that Merits No Weight in the Court's Sentencing Analysis

The Guideline applicable to violating the Arms Export Control Act (USSG § 2M5.2) provides, in its entirety, as follows:

> **§2M5.2.** Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License
>
> (a)   Base Offense Level:
>
> (1)   26, except as provided in subdivision (2) below;
>
> (2)   14, if the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two, (B) ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500, or (C) both.

This Guideline is striking in a number of ways. First, while the offense has a "safe harbor" provision applicable to any offense involving up to two semi-automatic rifles, combined with up to 500 pieces of matching ammunition, it has no safe harbor for up to 500 *parts* of assault weapons. Or for 50 parts of assault weapons. Or for any number of parts of less dangerous weapons, such as the handgun parts at issue here. So where, as here, an offense involves handgun parts, the Guideline

5

applies the higher offense level – 26 – as opposed to the level 14 that would apply to a person smuggling the sort of arsenal typically used in a mass-shooting event or an act of terrorism (two semi-automatic rifles and hundreds of pieces of ammunition for them). Second, the Guideline applies the same offense level – 26 – to an extraordinary breadth of items. *See* USSG § 2M5.2 App. Note 1 ("The items subject to control constitute the United States Munitions List. . . . Included in this list are such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms."). Thus, an offense like this one, involving parts of handguns, is subject to the same offense level – 26 – as an offense involving attack helicopters, land mines, or fully-operational automatic weapons. And, as already noted, an offense involving handgun parts is subject to a much higher offense level – by 12 levels – than one involving roughly the same arsenal that was used in the recent terrorist attacks in San Bernadino, California or Orlando, Florida.

Indeed, a comparison to a closely-related Guideline (§ 2M5.1, which applies to illegal transactions with nations that are subject to export sanctions) reveals another absurd result. The same base offense level of 26 applied here for attempting to export handgun parts from the United States to an ally of the United States applies under § 2M5.1 to evasion of export controls related to nuclear, chemical or biological weapons intended for an enemy of the United States. In other words, the Guidelines literally equate the instant offense not only with illegally exporting tanks or fighter jets, but also with selling chemical or biological weapons to Iran or Syria.

Again, this is akin to equating a marijuana possession offense with a cartel-level importation conspiracy, or a several-thousand-dollar financial crime with Bernie Madoff's ponzi scheme. The Guidelines sensibly draw enormous distinctions between those offenses, because they are

enormously different. But the Guideline at issue here fails to differentiate the most serious offenses from the least serious, nor does it even try to do so. It simply lumps them all together into offense level 26. This makes no sense. The resulting sentencing range deserves no weight in this Court's sentencing analysis.

In this regard, the history of § 2M5.2 is illuminating. It reveals that the Guideline as it now stands is not based on empirical sentencing data, but instead on a Congressional directive to increase the punishment for illegally exporting weapons of mass destruction.[1] As originally implemented in 1987, § 2M5.2 provided for two base offense levels: level 14 applied to all but the most serious offenses, and a higher offense level of 22 applied where "sophisticated weaponry" was involved. *See* USSG § 2M5.2 (1987). In 1990, the class of eligible offenses for the lower base offense level was narrowed to "[offenses that] involved only non-fully-automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten." USSG App. C, Amend. 337 (Nov. 1, 1990). This Amendment was adopted with little commentary. Supposedly it was intended to "better distinguish the more and less serious forms of offense conduct covered," *see id.*, but it ironically resulted in the grouping of handgun parts in the same offense level as tanks, fighter jets and sophisticated missile systems. Then, in 2001, § 2M5.2 was amended again, this time as a result

---

[1] As this Court is aware, a sentencing court is entitled to independently determine to what extent a Sentencing Guideline reflects sound sentencing policy, and to give as much or as little weight to the resulting sentencing range as it determines appropriate. *See Kimbrough v. United States*, 552 U.S. 85 (2007). That is particularly true in the case of a Guideline that is not premised on empirical data. The Supreme Court has recognized that when the Sentencing Commission fails to fulfill its statutory role and premises a Guideline on considerations other than empirical evidence and national experience, the sentencing court may give less deference to that Guideline. *Id.* at 109-10 (2007) (where a Guideline is not the product of "empirical data and national experience," it is not an abuse of discretion for a sentencing court to conclude that the recommended sentence fails to achieve the purposes of sentencing set forth in § 3553(a)).

of Congressional concern that the penalties were inadequate for exportation offenses involving weapons of mass destruction, specifically "nuclear, chemical, and biological weapons, materials, or technologies." USSG App. C, Amend. 633 (Nov. 1, 2001). Rather than adopt specific offense characteristics to address this concern, however, the Sentencing Commission chose to raise the base offense level to 26 for all offenders, excepting the narrow class of defendants subject to the lower base offense level.[2] Since 2001, therefore, the illegal exportation of handgun parts has been subject to the base offense level of 26 that was adopted to penalize the illegal exportation of weapons of mass destruction.

**IV.     This Court and Others Have Routinely Varied Downward from the Advisory Sentencing Range in Cases Like This**

As the government effectively concedes in its Sentencing Memorandum by identifying as its best comparator cases three sentences from around the country of about half of the low end of the Guideline range calculated here, a significant downward variance is appropriate here. To find analogous cases, however, there is no need to search the entire country; there are a number of analogous cases that have been prosecuted in this court. In *United States v. Ahmed,* 1:08-cr-95(TSE), for example, this Court imposed a sentence of five months on a defendant who attempted to export 48 "assault-type rifle components" to Sudan by placing them in his wife's luggage. *See United States v. Ahmed*, Statement of Facts (dkt # 19) ¶ 3. As was the case here, Mr. Ahmed had previous experience with the export-control laws; he had a prior shipment of firearms parts interdicted on its way to Sudan in a year earlier, at which time he had been interviewed by ICE and

---

[2]     The scope of the "safe harbor" created by the lower offense level was further narrowed in 2011 when the Commission reduced the number of qualifying firearms that a defendant could export from ten to two. USSG App. C, Amend. 753 (Nov. 1, 2011).

informed that he could not export such items without a license. *Id.* ¶ 5. Moreover, the country to which those weapons were intended was among the most dangerous in the world, with significant consequences for the national security of the United States. *United States v. Ahmed*, Affidavit in Support of Criminal Complaint (dkt # 2) ¶ 5 (at the time of the offense, Sudan had a "well-established association with fundamental Islamic terrorist organizations," and "hundreds of thousands of people [had] been killed and millions displaced" in the "continuing conflict" in Darfur). Finally, the evidence in the *Ahmed* case indicated a far greater pattern of illegal exportation than the items that were actually interdicted, because the investigation identified many additional purchases of export-controlled firearms parts over the year leading up to Mr. Ahmed's arrest than the items that had been interdicted; Mr. Ahmed did not have those items in his possession at the time of his arrest, and they were therefore believed to have been exported to Sudan. *Id.* ¶¶ 28-31.

As noted at the outset, there are of course differences between the cases – Mr. Ahmed, for example, neither went to trial nor was found to have falsely testified. Those differences are accounted for in the sentence requested here, however, in at least three ways: i) the sentence requested here is 60% longer than this Court imposed upon Mr. Ahmed; ii) Sudan, unlike Turkey, was the subject of export sanctions at the time of the offense, *see id.* ¶ 11; and iii) the firearms parts Mr. Ahmed sought to export were parts of assault weapons rather than handguns, resulting in a much greater danger than exists in this case that the exported items would be used by a terrorist organization or in some other manner directly implicating the national security interests of the United States.

Similarly instructive is the 42-day sentence this Court imposed upon Mr. Ahmed's wife, Entisar Babikir Hagosman. According to the Affidavit in the case, Ms. Hagosman committed the

same offense as her husband (she was the one who took the assault-weapon parts in her luggage and attempted to export them to Sudan). *See United States v. Hagosman*, 1:08-cr-96(TSE), dkt. # 2 ¶¶ 14-16. Moreover, she did so with full knowledge that the parts were in her luggage, and with full knowledge of the export prohibition, which she gleaned from the 2006 encounter with law enforcement, at which she was present. *Id.* ¶¶ 17-19. She was nonetheless permitted to plead guilty to a different offense (making a false statement), and this Court imposed a sentence of the 42 days she had already served. *See id.*, dkt # 26, 28.

Similarly, in *United States v. Alzawawy*, 1:14-cr-281, this Court departed from an advisory sentencing range of 46-57 months (based on the same offense level applicable here, but with acceptance of responsibility and without an obstruction enhancement) to a sentence of three years of supervised probation with a condition of three months' community confinement. In Mr. Alzawawy's case, the defendant was found to have attempted to export at least 13 firearms parts to Saudi Arabia by concealing them in Sony Play Stations, and had, at the time of his arrest, already purchased additional parts for shipment at a later date. *United States v. Alzawawy*, 1:14-cr-281, Affidavit in Support of Criminal Complaint (dkt # 2) ¶ 21. Further, Mr. Alzawawy admitted that the reason he concealed the parts within Sony Play Stations was that he knew he could get in legal trouble for exporting firearms parts from the United States. *Id.* ¶ 22. Importantly, the United States Attorney's Office in that case argued to this Court that a "brief period of incarceration" was appropriate, and that such a "brief period" would be sufficient to accomplish general deterrence. *United States v. Alzawawy*, 1:14-cr-281, Position of the United States with Respect to Sentencing (dkt # 26) at 1. Indeed, because the defendant in *Alzawawy*, like Mr. Kolsuz, had no prior record, had substantial family support, and presented minimal risk of future danger to the United States, the

government argued in that case that the *only* reason to impose *any* period of incarceration was the need to accomplish general deterrence. *Id.* at 3. As noted above, this Court departed from a range of 46-57 months and imposed a sentence of probation with three months in community confinement.

The sentences imposed by this Court upon Mr. Ahmed, Ms. Hagosman, and Mr. Alzawawy are not outliers, but are in line with other sentences imposed in this district in recent years. In *United States v. Bishop*, 1:12-cr-395(CMH), for example, the defendant was found guilty at trial of exporting 7,496 rounds of ammunition to Jordan, and admitted to having shipped a shotgun in an earlier shipment. His Sentencing Guideline range was 63-78 months (based on the same Guideline applicable here, without an adjustment for obstruction of justice), but the court imposed a sentence of two years' probation with a condition of six months in home confinement. Similarly, in *United States v. Boateng*, 1:13-cr-30(AJT), the defendant pleaded guilty to exporting or attempting to export 11 firearms to Ghana by concealing them underneath other items in shipping boxes, but was permitted to plead to an offense other than under the Arms Export Control Act (he pleaded guilty to a violation of 18 U.S.C. § 922(e)), and was sentenced to two years of probation with a condition of 60 days in home confinement. And in the cases of Nader and Samer Alhnaity, Judge Cacheris imposed time-served sentences (2 days and 4 days, respectively), followed by three year terms of supervised release, upon the Alhnaitys for sending repeated shipments of firearms to Jordan and smuggling them out of the United States in cars and shipping containers; they had a long history of shipping such items, and were, at the time of their arrest, specifically interested in acquiring and exporting automatic weapons, suppressors, and silencers. *See United States v. Alhnaity*, 1:14-mj-306, Affidavit in Support of Criminal Complaint, ¶¶ 8-11; *see also United States v. Samer Alhnaity*, 1:14-cr-291(JCC), Judgment (dkt # 32); *United States v. Nader Alhnaity*, 1:14-cr-293(JCC),

11

Judgment (dkt # 36). While the Alhnaitys both pleaded to different charges than Mr. Kolsuz, the conduct is obviously similar and, in some ways, far more serious. Nonetheless, they received sentences of only a few days each.

## V. Application of the Statutory Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

As set forth in the PSR, Mr. Kolsuz is a 43 year old native and citizen of Turkey with little connection to the United States and no prior criminal record of any kind. Despite having only an elementary school education, he has worked steadily since age 12, and is a successful business owner in Turkey. Indeed, he now owns and operates a business in the same industry in which he began working in a factory upon leaving school at 12 years old.

As noted at the outset, Mr. Kolsuz's incarceration in this case has been unusually difficult. Unlike offenders who speak either English or Spanish, he has virtually noone with whom he can converse while in custody. Nor does he have access to any form of media or reading material in a language he can understand. And, having been arrested here while transiting Dulles Airport, he has no connection to the local area, and no family or friends in the area to visit him. Finally, he is incarcerated far from his family, and has not had any substantial communication with his twelve year old daughter since his arrest. In these circumstances, a sentence of the eight-plus months Mr. Kolsuz has served is sufficient not only to deter Mr. Kolsuz specifically, but also to accomplish general deterrence.

Moreover, as also noted at the outset, Mr. Kolsuz presents virtually zero risk of recidivism. The instant offense was committed as a result of his ability to legally travel to the United States, which he will no longer be able to do because the instant conviction constitutes an aggravated felony. And there is absolutely nothing in Mr. Kolsuz's background or the facts of this case suggesting that he presents any risk of committing any other offense in or against the United States. Accordingly, Mr. Kolsuz simply does not present any risk of recidivism or future danger to the United States.

**CONCLUSION**

For the foregoing reasons, Mr. Kolsuz submits that a sentence of the eight-plus months he has already served fully accounts for the § 3553 sentencing factors in this case. Further, in light of his impending removal and the substantial forfeiture in this matter, Mr. Kolsuz agrees with the Probation Officer that he should not be ordered to pay a fine. *See* PSR ¶ 62. Finally, Mr. Kolsuz submits that, in light of his impending removal, as well as the fact that this conviction will permanently bar him from re-entering the United States, a period of supervised release should not be imposed. Given that Mr. Kolsuz has never entered the United States illegally, and that there is no reasonably foreseeable likelihood that he would do so in the future, the Court should follow the recommendation of USSG § 5D1.1(c) and decline to impose a period of supervised release.

Respectfully submitted,

HAMZA KOLSUZ

By Counsel,

Geremy C. Kamens,
Federal Public Defender


By: ___/s/_____
Todd M. Richman
Va. Bar # 41834
Assistant Federal Public Defender
Attorney for Mr. Kolsuz
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0845 (telephone)
(703) 600-0880 (facsimile)
Todd_Richman@fd.org (email)

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2016, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Dennis Fitzpatrick
Assistant United States Attorney
Heather Alpino
Special Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

A copy of the foregoing Memorandum will also be served upon Senior United States Probation Officer Nina S. Blanchard via electronic mail.

                                                      /s/
                                       Todd M. Richman
                                       Va. Bar # 41834
                                       Assistant Federal Public Defender
                                       Attorney for Mr. Kolsuz
                                       1650 King Street, Suite 500
                                       Alexandria, Virginia 22314
                                       (703) 600-0845 (telephone)
                                       (703) 600-0880 (facsimile)
                                       Todd_Richman@fd.org (email)